24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2024

(Argued: March 20, 2025     Decided: August 13, 2025)

Docket Nos. 24-1499-cv(L); 24-1503-cv(CON)

———————————————

STATE OF NEW JERSEY, STATE OF NEW YORK, STATE OF CONNECTICUT,
*Plaintiffs-Appellants*,

v.

SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE UNITED STATES
DEPARTMENT OF THE TREASURY AND ACTING COMMISSIONER OF THE INTERNAL
REVENUE SERVICE, UNITED STATES DEPARTMENT OF THE TREASURY,
INTERNAL REVENUE SERVICE,
*Defendants-Appellees*.

———————————————

VILLAGE OF SCARSALE, NEW YORK,
*Plaintiff-Appellant*,

v.

INTERNAL REVENUE SERVICE, UNITED STATES DEPARTMENT OF THE
TREASURY, SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE
UNITED STATES DEPARTMENT OF THE TREASURY AND ACTING COMMISSIONER OF THE
INTERNAL REVENUE SERVICE,
*Defendants-Appellees*.*

———————————————

1

\* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), the Clerk of Court is respectfully
directed to amend the official caption as set forth above.

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

Before:        SACK, ROBINSON, AND PÉREZ, *Circuit Judges.*

In 2019, the Treasury Department and Internal Revenue Service (the "IRS") finalized a regulation (the "Final Rule") interpreting 26 U.S.C. § 170, which governs the tax deduction of charitable contributions made to qualified organizations.  The Final Rule requires that a taxpayer claiming a charitable-contribution deduction under § 170(c) reduce that deduction "by the amount of any state or local tax credit that the taxpayer receives or expects to receive in consideration for the taxpayer's payment or transfer."  26 C.F.R. § 1.170A-1(h)(3)(i).

New Jersey, New York, Connecticut, and the Village of Scarsdale each administers or plans to implement tax-credit programs implicated by the Final Rule.  They sued the Treasury, IRS, and their officers (the "Government") in the U.S. District Court for the Southern District of New York, alleging that the IRS exceeded its statutory authority under 26 U.S.C. § 170 in promulgating the Final Rule and that the Final Rule is arbitrary and capricious under the Administrative Procedure Act.  The district court (Paul G. Gardephe, *Judge*) granted summary judgment for the Government, relying on *Chevron* deference to conclude that the IRS's interpretation of ambiguous statutory language in § 170 is a permissible construction of the statute, and that the Final Rule is not arbitrary and capricious.

On appeal, we first confirm that at least New York and Scarsdale have Article III standing to bring their claims, which is sufficient for us to hear all Appellants' claims.  We conclude also that because there is no other statutory procedure by which Appellants may contest the Final Rule, the Anti-Injunction Act does not bar our hearing this appeal.

On the merits, we consider whether the IRS exceeded its statutory authority in light of the Supreme Court's overturning of *Chevron* in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).  We interpret 26 U.S.C. § 170 and its implicit *quid pro quo* principle to allow the Final Rule's prohibition of a tax deduction where the taxpayer has received a corresponding tax credit from the recipient of a donation—the very premise of Appellants' tax-credit programs.  We finally decide that the Final Rule is not arbitrary or capricious.  We therefore AFFIRM the judgment of the district court.

2

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

CHRISTOPHER J. IOANNOU, Deputy Attorney General (Jeremy M. Feigenbaum, Solicitor General, *on the brief*), for Matthew J. Platkin, Attorney General of New Jersey, Trenton, NJ; (Barbara D. Underwood, Solicitor General, Ester Murdukhayeva, Deputy Solicitor General, for Letitia James, Attorney General of New York, New York, NY, *on the brief*); (Joshua Perry, Michael Skold, Solicitors General, for William Tong, Attorney General of Connecticut, Hartford, CT, *on the brief*), *for Plaintiffs-Appellants State of New Jersey, State of New York, State of Connecticut.*

DANIEL A. ROSEN, Baker & McKenzie LLP, New York, NY (Andrew Weiner, Kostelanetz LLP, Washington, DC, Todd Welty, Kostelanetz LLP, Atlanta, GA, *on the brief*), *for Plaintiff-Appellant Village of Scarsdale, New York.*

REBECCA S. TINIO, Assistant United States Attorney (Benjamin H. Torrance, Assistant United States Attorney, *on the brief*) for Jay Clayton, United States Attorney for the Southern District of New York, New York, NY, *for Defendants-Appellees.*

SACK, *Circuit Judge*:

In 2017, Congress ended the unlimited federal tax deduction for state and local taxes ("SALT"), capping the deduction at $10,000. Shortly thereafter, New Jersey, New York, Connecticut (together, the "States"), and the Village of

3

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

Scarsdale, New York ("Scarsdale") each enacted laws designed to help residents

recover some of the tax benefit they had enjoyed under the uncapped SALT

deduction by using a different deduction allowed by the federal tax code.

Through these state and local programs, residents may voluntarily contribute

money to a state-administered charitable fund and receive a sizeable state or

local tax credit in return.  Appellants envisioned that contributors could then

deduct the full amount of their contributions from their federal taxable incomes

pursuant to the charitable-contribution deduction codified at Internal Revenue

Code ("I.R.C.") § 170.  *See* 26 U.S.C. § 170.  But the Internal Revenue Service and

Treasury Department (together, the "IRS")[1] soon promulgated a new regulation

(the "Final Rule"), upending Appellants' tax-credit programs.

The Final Rule, which interprets I.R.C. § 170, requires that a taxpayer

claiming a charitable-contribution deduction reduce that deduction "by the

amount of any state or local tax credit that the taxpayer receives or expects to

receive in consideration for the taxpayer's payment or transfer."  26 C.F.R.

§ 1.170A-1(h)(3)(i).  In effect, this nullifies any federal tax benefit a taxpayer

might derive from participation in Appellants' tax-credit programs.  The States

---

[1] The Internal Revenue Service is an executive branch agency housed within the Treasury Department.  *See, e.g., Samuels, Kramer & Co. v. Comm'r*, 930 F.2d 975, 991 (2d Cir. 1991).

4

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

and Scarsdale sued the IRS and its officers (the "Government") in the U.S.

District Court for the Southern District of New York, alleging, among other

things, that the IRS exceeded its statutory authority under I.R.C. § 170 in

promulgating the Final Rule and that the Final Rule is arbitrary and capricious

under the Administrative Procedure Act.  The district court (Paul G. Gardephe,

*Judge*) granted summary judgment for the Government, relying on *Chevron*

deference to conclude that the IRS's interpretation of ambiguous statutory

language in I.R.C. § 170 is a permissible construction of the statute, and that the

Final Rule is not arbitrary or capricious.  *See generally New Jersey v. Mnuchin*, Nos.

19 Civ. 6642, 19 Civ. 6654, 2024 WL 1386080 (S.D.N.Y. Mar. 30, 2024).

On appeal, we first confirm that at least New York and Scarsdale have

Article III standing to bring their claims, which is sufficient for us to hear all

Appellants' claims.  We conclude also that because there is no other statutory

procedure by which Appellants may contest the Final Rule, the Anti-Injunction

Act does not bar our hearing this appeal.

On the merits, we revisit anew the question of whether the IRS exceeded

its statutory authority in light of the Supreme Court's overturning of *Chevron* in

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).  *Loper Bright* requires

5

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

that, rather than defer to agency interpretation of ambiguous statutory language, we "use every tool at [our] disposal to determine the best reading of the statute and resolve the ambiguity."  603 U.S. at 400.[2]  We interpret I.R.C. § 170 and its implicit *quid pro quo* principle to allow the Final Rule's prohibition of a tax deduction where the taxpayer has received a corresponding tax credit from the recipient of a donation—the very premise of Appellants' tax-credit programs. We finally decide that the Final Rule is not arbitrary or capricious.  We therefore **AFFIRM** the judgment of the district court.

## BACKGROUND

### I.    Factual Background

On December 22, 2017, President Trump signed into law the Tax Cuts and Jobs Act (the "2017 Tax Act"), which capped federal income-tax deductions of state and local taxes at $10,000 for individuals and married taxpayers filing jointly, and at $5,000 for married taxpayers filing separately.[3]  *See* An Act to

---

[2] Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.

[3] On July 4, 2025, President Trump signed the One Big Beautiful Bill Act, which generally raises the SALT-deduction cap to $40,000 for taxable years 2025 through 2029, subject to a filer's income level.  In 2030, the SALT-deduction cap is set to revert to $10,000.  *See* An Act to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Pub. L. No. 119–21 sec. 70120.  These amendments to the SALT deduction do not affect this appeal.

6

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

Provide for Reconciliation Pursuant to Titles II and V of the Concurrent

Resolution on the Budget for Fiscal Year 2018, Pub. L. No. 115–97 (codified in

relevant part at 26 U.S.C. § 164(a)-(b)). Before that, taxpayers were allowed to

deduct much if not all of their SALT liability from their federal taxable income,

subject to certain limitations.[4]

      The states of New Jersey, New York, and Connecticut all have large

populations of taxpaying residents whose annual SALT liability exceeds the 2017

Tax Act's $10,000 deduction cap.[5] In response to the new limit on SALT

deductions, those States sought a work-around that would mitigate the effects of

---

[4] The SALT deduction dates to Congress's earliest attempt to levy a federal income tax to finance the Civil War, which included "a nearly unlimited SALT deduction." *See New York v. Yellen*, 15 F.4th 569, 572–73 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 1669 (2022). The Supreme Court later struck down the Civil War-era income tax, holding that "it violated the constitutional prohibition against direct taxes not apportioned among the States in proportion to their relative populations." *Id.* at 573 (citing *Pollock v. Farmers' Loan & Tr. Co.*, 158 U.S. 601, 637 (1895)). After the Sixteenth Amendment was ratified in 1913, empowering Congress to tax incomes without regard to state apportionment, Congress immediately reinstated the federal income tax, with deductions permitted for "all national, State, county, school, and municipal taxes paid within the year, not including those assessed against local benefits." *Id.* (quoting Act of Oct. 3, 1913, ch. 16, § II(B), 38 Stat. 114, 167). The SALT deduction has persisted in the federal tax code in various forms, and subject to various limitations, since then. *Id.* at 573–74. In the period immediately preceding enactment of the 2017 Tax Act, "[e]ligible taxpayers could, subject to [various requirements], always elect to deduct *all* state and local real and personal property taxes as well as either all state and local income taxes or all state and local sales taxes." *Id.* at 574.

[5] Those three states, plus Maryland, sued to enjoin enforcement of the SALT-deduction cap, claiming it was unconstitutional on its face or unconstitutionally coerced them to abandon their preferred fiscal policies. We rejected those arguments in *Yellen*, 15 F.4th at 579–84.

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

the SALT-deduction cap on their residents.  Each passed laws establishing state-

administered charitable funds or empowering localities to create similar funds.

Residents may make voluntary payments to those funds and receive a state or

local tax credit in return.[6]  The state or locality can then invest the funds in public

programs like those otherwise financed by general tax revenues.  This was not a

novel policy innovation; many states already had longstanding programs in

---

[6] The laws adopted in each jurisdiction function alike but are not identical.  New York was the first to act.  It created a state-administered charitable trust to support public healthcare and education initiatives.  N.Y. State Fin. Law § 92-gg.  In exchange for a contribution to the trust, a taxpayer in New York receives a state tax credit equal to 85% of her contribution.  N.Y. Tax Law § 606(iii).  New York also authorized localities to establish similar charitable trusts and to offer local property-tax credits equal to up to 95% of a contribution's value.  N.Y. Gen. Mun. Law §§ 6-t, 6-u; N.Y. Real Prop. Tax Law § 980-a.  Pursuant to this authorization, the Village of Scarsdale, New York created its own charitable fund and affiliated tax-credit program in which an owner of real property in Scarsdale can receive a property-tax credit worth 95% of his contribution to the fund.  Scarsdale Village Code §§ 268-35–268-38.

New Jersey likewise empowered localities to establish charitable funds for public purposes.  A taxpayer who contributes to such a fund is entitled to a property-tax credit equal to 90% of the contribution amount.  N.J. Stat. Ann. §§ 54:4-66.6–66.9.

Connecticut's law enables municipalities to designate "community supporting organizations" to receive donations in exchange for property-tax credits worth the lesser of (1) the amount of property tax owed by the donor, or (2) 85% of the amount of the donation.  Conn. Gen. Stat. Ann. § 12-129v(b)–(c).  A "community supporting organization" is one that, among other requirements, is "organized solely to support municipal expenditures for public programs and services, including public education" and must remit all donations received to the municipality.  *Id.* § 12-129v(a)(2)(B).

Because the tax credits each Appellant offers do not match donations dollar-for-dollar, the programs were expected to generate a net increase in state and local revenues to support a range of public projects.

8

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

place to incentivize charitable giving with the offer of a tax credit.  *See* Joseph

Bankman et al., *State Responses to Federal Tax Reform: Charitable Tax Credits*, 87

State Tax Notes 433 (2018) (cataloguing more than 100 charitable tax credits in 33

states).  But the States acknowledge that the tax-credit programs at issue here

were enacted specifically in response to the new federal limit on SALT

deductions.

Through these state and local programs, a taxpayer can contribute to her

jurisdiction's designated fund, receiving a tax credit that offsets her SALT

liability by an amount worth 85 to 95 percent of her contribution.  She could

then, the States reasoned, deduct the contribution amount from her federal

taxable income using the tax deduction for charitable contributions codified at

I.R.C. § 170.  That provision includes in its definition of "charitable contribution"

a "contribution or gift to or for the use of . . . [a] State . . . or any political

subdivision [thereof], . . . but only if the contribution or gift is made for

exclusively public purposes."  26 U.S.C. § 170(c)(1).

To illustrate, consider a hypothetical unmarried taxpayer in New York

who owes $200,000 in state taxes.  She might opt to give $200,000 to New York's

designated charitable fund, for which she would accrue a state-tax credit of

9

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

$170,000, leaving her remaining state-tax liability at $30,000. *See* N.Y. Tax Law §

606(iii) (authorizing an 85% tax credit). Then, when filing her federal tax return,

she could deduct that $200,000 from her income as a charitable-contribution

deduction. Assuming her income places her in the highest marginal bracket for

federal income tax—currently set at 37%, *see* 26 U.S.C. § 1(j)—the deduction saves

her $74,000 in federal tax. By taking advantage of the charitable-contribution

deduction, which is *not* subject to a $10,000 limit, taxpayers in the States willing

to make such contributions could thereby recover some of the federal tax benefit

they had enjoyed under the previously uncapped SALT deduction.

Except the IRS got wise. On August 27, 2018, the IRS issued a notice of

proposed rulemaking (the "Proposed Rule"). *See Contributions in Exchange for*

*State or Local Tax Credits*, 83 Fed. Reg. 43,563 (proposed Aug. 27, 2018). The IRS

observed that "it has become increasingly common for states and localities to

provide state or local tax credits in return for contributions by taxpayers to or for

the use of certain entities listed in section 170(c)." *Id.* at 43,564. The Proposed

Rule would require taxpayers to reduce any charitable-contribution deduction

claimed on federal income-tax returns by the amount of any state or local tax

credit received "in consideration for the taxpayer's payment or transfer." *Id.* at

10

43,571.  Exempted from this new requirement were tax credits amounting to 15 percent or less of a taxpayer's contribution.  *Id.*

After a period of public comment, the IRS promulgated a new regulation governing the availability of the charitable-contribution deduction (the "Final Rule").[7]  *See Contributions in Exchange for State or Local Tax Credits*, 84 Fed. Reg. 27,513 (June 13, 2019).  Interpreting I.R.C. § 170, the Final Rule states, "if a taxpayer makes a payment or transfers property to or for the use of an entity described in section 170(c), the amount of the taxpayer's charitable contribution deduction under section 170(a) is reduced by the amount of any state or local tax credit that the taxpayer receives or expects to receive in consideration for the taxpayer's payment or transfer."  26 C.F.R. § 1.170A-1(h)(3)(i).  Consistent with the Proposed Rule, the Final Rule retains an exception for any state or local tax credit worth 15 percent or less of a taxpayer's contribution.  *Id.* § 1.170A-1(h)(3)(vi).

---

[7] Over 7,700 comments were submitted and 25 entities requested to speak at a November 5, 2018 public hearing.  *Contributions in Exchange for State or Local Tax Credits*, 84 Fed. Reg. 27,513, 27,514 (June 13, 2019).  About 70% of the comments recommended that the IRS finalize the Proposed Rule without change.  *Id.* at 27,515.  The States each submitted comments opposing the Proposed Rule, and Scarsdale submitted comments requesting that the Proposed Rule be withdrawn.

Under the Final Rule, the same New York taxpayer who contributes

$200,000 to that state's designated fund and receives a corresponding state-tax

credit worth $170,000 may claim only a $30,000 charitable-contribution deduction

on her federal income-tax return (subtracting the $170,000 state-tax credit from

the $200,000 contribution). *See* 26 C.F.R. § 1.170A-1(h)(3)(vii) (providing

examples of how the Final Rule applies). Her federal-tax savings (again,

assuming taxation at the 37% marginal rate) are now just $11,100—a far cry from

the $74,000 she saved before implementation of the Final Rule.

Notably, the Final Rule distinguishes between those charitable

contributions that yield a corresponding state *tax credit* and those that entitle the

donor to a state *tax deduction*. Tax credits and tax deductions are two distinct

types of tax benefit. Generally, "[a] credit has greater value to the taxpayer than

a deduction or exemption. A credit directly reduces the amount of tax that must

be paid, dollar for dollar, whereas a deduction reduces tax liability only

indirectly by reducing the taxable [income]." *United States v. Hemme*, 476 U.S.

558, 561 n.1 (1986). Although the Final Rule bars federal deductions of

contributions for which the taxpayer receives a state or local tax credit, it

provides that a state tax deduction claimed by a taxpayer for his contribution to a

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

charitable entity does not "reduce [the federal] charitable contribution deduction

under section 170(a)," provided that the state deduction "do[es] not exceed the

amount of the taxpayer's payment or the fair market value of the property

transferred by the taxpayer." 26 C.F.R. § 1.170A-1(h)(3)(ii). In other words, the

Final Rule does not prevent a taxpayer from deducting in full a charitable

contribution on his federal tax return, even though he also claimed the same

deduction on his state tax return. It also does not require a taxpayer to reduce

his charitable-contribution deduction by the value to him of the federal

deduction itself. The Final Rule became effective on August 12, 2019. *See* 84 Fed.

Reg. 27,513.

After New York enacted its tax credit program in April 2018, but before the

IRS published the Proposed Rule in August of that year, New York's designated

public fund received $78.7 million from 487 contributions. After publication of

the Proposed Rule, contributions to New York's public fund "sharply

decreased," totaling just $25,416 from 17 contributions in 2019, the year the Final

Rule became effective. Joint App'x at 77. In 2018, the fund established by

Scarsdale received over $500,000 in contributions. Since the publication of the

Proposed Rule, Scarsdale's fund has received no further contributions. Localities

13

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

in New Jersey and Connecticut had not yet finalized their public funds at the time the Proposed Rule was announced and halted their plans after it was published.

## II.    Procedural Background

On July 17, 2019, Scarsdale initiated its action against the Internal Revenue Service, the Treasury, and certain officers of these bodies in the U.S. District Court for the Southern District of New York, alleging that the Final Rule's interpretation of I.R.C. § 170 is contrary to law and arbitrary and capricious, in violation of the Administrative Procedure Act (the "APA"), 5 U.S.C. § 706.  The next day, the States sued the same defendants in the Southern District, alleging the same APA violations.[8]  The cases were deemed related and assigned to the same district court judge.

The Government moved to dismiss both complaints on the basis that the plaintiffs lack Article III standing and that the claims are barred by the Anti-Injunction Act, 26 U.S.C. § 7421(a).  The Government moved in the alternative for summary judgment, arguing that the IRS acted within its statutory authority in

---

[8] The States also brought a claim under the Regulatory Flexibility Act, 5 U.S.C. §§ 601–12, which the district court dismissed on the Government's motion.  The States have not pursued this claim on appeal.

14

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

promulgating the Final Rule and that the Final Rule is not arbitrary or capricious.

The plaintiffs in both cases cross-moved for summary judgment, arguing that the

Final Rule is unlawful because it conflicts with the meaning of I.R.C. § 170 and

therefore exceeds the IRS's statutory authority, and relies on irrational

distinctions that are arbitrary and capricious.[9]

On March 30, 2024, the district court issued its memorandum opinion and

order.  *See Mnuchin*, 2024 WL 1386080, at *1.  It held that New Jersey and

Connecticut "ha[d] not demonstrated that they have standing" and dismissed

their claims against the Government.  *Id.* at *11–13.  The court concluded that

New York and Scarsdale, on the other hand, had standing to bring their claims

because they "demonstrated an injury in fact and causation, and that their

alleged injury is redressable."  *Id.* at *13–14.  The district court then held that the

Anti-Injunction Act did not bar New York's and Scarsdale's claims.  *Id.* at *15–17.

As to the merits, the district court applied *Chevron* deference and

concluded that the IRS did not exceed its statutory authority in promulgating the

Final Rule.  *Id.* at *18–28; *see Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467

U.S. 837 (1984), *overruled by Loper Bright*, 603 U.S. at 412–13.  Nor, it held, is the

_____

[9] Briefing in the two related cases proceeded in tandem before the district court.  The Government's briefing in the two actions was identical.

15

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

Final Rule arbitrary and capricious.  *Mnuchin*, 2024 WL 1386080, at *28–30.

Accordingly, the district court granted in part and denied in part the

Government's motions to dismiss, granted the Government's motions for

summary judgment, and denied the plaintiffs' motions for summary judgment.

*Id.* at *30.

The States and Scarsdale timely appealed.[10]

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's decision on a motion to

dismiss for lack of subject-matter jurisdiction.  *Chinniah v. FERC*, 62 F.4th 700, 702

(2d Cir. 2023).  We also review *de novo* a district court's review of agency action.

*Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (2d Cir. 2022).  Where,

as here, an APA-based challenge to agency action presents "a pure question of

law, a district court's procedural decision to award summary judgment is

generally appropriate," and "[w]e review *de novo* such a grant."  *Aleutian Cap.*

*Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020).

## DISCUSSION

## I.     Article III Standing

---

[10] On July 10, 2024, this Court granted the Government's unopposed motion to consolidate the States' and Scarsdale's appeals.

16

Before the district court, the Government contested Appellants'

constitutional standing to challenge the Final Rule.  Localities in New Jersey and

Connecticut had not yet finalized their public funds at the time the IRS

announced the Proposed Rule, and they halted their plans to do so after it was

published.  The district court accordingly held that any injury to those states'

public funds was "highly attenuated" and too "speculative" to support standing,

as the "potential tax credit programs . . . were never established."  *Mnuchin*, 2024

WL 1386080, at *11.  New York and Scarsdale, though, *had* implemented their

tax-credit programs by the time the IRS rolled out the Proposed Rule, and each

could point to an "actual and imminent" dive in program-related revenues "as a

direct result of the 2018 Proposed Rule and the 2019 Final Rule."  *Id.* at *13.

Those parties, the district court held, do have standing to challenge the Final

Rule.  *Id.* at *13–14.

On appeal, the Government appears to have relinquished its position that

Appellants lack standing to pursue their claims, instead limiting its justiciability

argument to the contention that the Anti-Injunction Act bars this suit, which

topic we address below.  Nevertheless, it is well established that we have "an

independent obligation to assure that standing exists, regardless of whether it is

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

challenged by any of the parties." *Antonyuk v. James*, 120 F.4th 941, 1039–40 (2d

Cir. 2024). We conclude that New York and Scarsdale indeed have standing and

that their standing is sufficient for us to hear all Appellants' claims.

Under Article III of the Constitution, "a plaintiff needs a personal stake in

the case." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023). "That is, the plaintiff must

have suffered an injury in fact—a concrete and imminent harm to a legally

protected interest, like property or money—that is fairly traceable to the

challenged conduct and likely to be redressed by the lawsuit." *Id.* "If at least one

plaintiff has standing, the suit may proceed." *Id.*; *see also Rumsfeld v. F. for Acad.*

*& Inst'l Rts., Inc.*, 547 U.S. 47, 52 n. 2 (2006) ("[T]he presence of one party with

standing is sufficient to satisfy Article III's case-or-controversy requirement.").

Our opinion in *New York v. Yellen*, 15 F.4th 569 (2d Cir. 2021), is instructive

on the standing issue. There, the states of New York, Connecticut, New Jersey,

and Maryland challenged the constitutionality of the $10,000 SALT-deduction

cap that is also the genesis of the present appeal. *Id.* at 574–75. The states in

*Yellen* alleged that the SALT-deduction cap would, among other things, make

homeownership more expensive because taxpayers could no longer deduct the

full amount of their property taxes from federally taxable income. *Id.* at 575.

18

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

This, in turn, would work a loss of tax revenues for the states by "reduc[ing] demand in the housing market, causing lower prices and fewer sales, and lead[ing] to specific losses in tax revenue derived from property and real estate transfer taxes." *Id.* at 576. We held that this was *not* the type of "generalized economic harm" that normally is insufficient to confer standing on a state government to challenge federal law. *Id.* at 576–77. Instead, "the chain of economic events" alleged by the states "str[uck] us as realistic, and the challenged action's effect on their residents' decisions seem[ed] to us entirely predictable." *Id.* at 577. The states' plausible allegation of "specific lost tax revenues" was enough to articulate an injury in fact and sufficed to support standing. *Id.*

Here, New York and Scarsdale each established public funds that offer contributors a tax credit ranging from 85 to 95 percent of a contribution, with the remaining tax collected generating a net increase in state and local revenue. Both proffered evidence that, before publication of the Proposed Rule, residents made significant contributions to the public funds, and each enjoyed a net increase in revenues that could then be spent on various public works and services. But the Proposed and Final Rules eliminated the incentive for residents to contribute, all

19

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

but destroying this revenue stream. "[D]eclarations from tax and budgetary experts" submitted by New York and Scarsdale, in addition to "basic economic logic," support the conclusion that the Final Rule caused both jurisdictions to "lose specific tax revenues." *Yellen*, 15 F.4th at 576–77. This monetary loss is sufficiently concrete and particularized to establish an injury in fact. *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 432–33 (2019).

As in *Yellen*, Appellants' injury here is "fairly traceable to the challenged conduct." *Biden*, 600 U.S. at 489. Whereas the states in *Yellen* demonstrated injury by tracing diminished property- and transfer-tax revenues to a diminution in homeownership, New York and Scarsdale demonstrate injury directly from the decline in contributions to their public funds after the Final Rule's publication. And, as the district court observed, it is likely that contributions to New York's and Scarsdale's public funds would resume if the Final Rule were held unlawful and set aside, satisfying standing's redressability component. *See Mnuchin*, 2024 WL 1386080, at *14.

Because "the presence of [at least] one party with standing is sufficient to satisfy Article III's case-or-controversy requirement," whether Connecticut and New Jersey also have standing is academic, and we decline to address the

20

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

question.  *See Rumsfeld*, 547 U.S. at 52 n.2; *see also Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (holding that that one plaintiff's "clear" injury is "sufficient to confer standing under . . . Article III" and that the Court "therefore need not consider the standing issue as to" other plaintiffs).

## II.     The Anti-Injunction Act

Having determined that the plaintiffs have standing, we turn to the Government's argument that this action is barred by the Anti-Injunction Act (the "AIA").  Because a well-established exception to the AIA applies here, we conclude that the AIA does not prevent our reaching the merits of Appellants' claims.

Notwithstanding the general rule that those adversely affected by agency action may sue under the APA, the AIA provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed."  26 U.S.C. § 7421(a); *see also* 5 U.S.C. § 701(a)(1) (providing that the APA does not apply when another "statute[] preclude[s] judicial review").  An aggrieved taxpayer, barred by the AIA from seeking injunctive relief, generally has two options to challenge a tax assessment he

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

thinks is unlawful:  He may (1) pay the disputed tax and then sue the IRS in

federal court for a refund—the so-called "pay first, litigate later" procedure, *see*

26 U.S.C. §§ 6532(a), 7422; *SEC v. Credit Bancorp, Ltd.*, 297 F.3d 127, 139 (2d Cir.

2002); or (2) withhold the disputed tax and fight the deficiency notice levied

against him in the U.S. Tax Court, *see* 26 U.S.C. §§ 6212, 6213.  *See also Enochs v.*

*Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962) ("The manifest purpose of

[the AIA] is to permit the United States to assess and collect taxes alleged to be

due without judicial intervention, and to require that the legal right to the

disputed sums be determined in a suit for refund.").

The Government contends that because Appellants' suits aim to "restrain

assessment or collection of taxes that would otherwise be due" by enjoining

enforcement of the Final Rule, they are barred by the AIA.  Gov't Br. at 24.  In the

Government's view, the Final Rule must instead be challenged by a taxpayer

"who pays the tax, then seeks a refund on the ground that the [Final Rule] was

unlawful and improperly increased their tax liability."  *Id.*  But the Supreme

Court rejected a similar proposition in *South Carolina v. Regan*, 465 U.S. 367, 378–

22

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

81 (1984), and we did the same in *New York v. Yellen*, 15 F.4th at 577–79, both of

which bind us here.[11]

In *Regan*, South Carolina sought an injunction against the federal Tax

Equity and Fiscal Responsibility Act ("TEFRA"), which taxed the interest on

certain state-issued, unregistered bearer bonds. *Regan*, 465 U.S. at 371–72.

Although South Carolina itself faced no direct tax liability under TEFRA—and

therefore could not "pay first, litigate later"—it argued that the tax's application

to its citizens "destroy[ed] [South Carolina's] freedom to issue obligations in the

form that it chooses." *Id.* at 371–72. The federal government urged that the AIA

precluded South Carolina's claim for injunctive relief, but the Supreme Court

held that the AIA "was not intended to bar an action where . . . Congress has not

provided the plaintiff with an alternative legal way to challenge the validity of a

tax." *Id.* at 373. South Carolina's suit could proceed because there was no other

"statutory procedure" by which it could contest TEFRA. *Id.* at 380. We applied

*Regan*'s logic in *Yellen*, holding that the states' challenge to the statutory SALT-

---

[11] The Government "acknowledges that both the district court and a panel of [this] Court are bound by [*Yellen*]," but nevertheless maintains that *Yellen* is incorrect to preserve that argument "in case of further review." Gov't Br. at 25.

23

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

deduction cap was justiciable because the states were otherwise "without *any*

forum in which to assert [their] tax claims." *Yellen*, 15 F.4th at 577.

So too here. Appellants "cannot assert their claims in a forum other than

federal court and cannot themselves bring a refund suit" because the Final Rule

imposes no direct tax obligations on them. *Yellen*, 15 F.4th at 578. Since

Congress has not provided Appellants with an alternative avenue to challenge

the Final Rule, the AIA does not bar their suits. Nor are Appellants "obliged to

find taxpayers willing to litigate their claims and trust that those taxpayers will

litigate them effectively." *Id.* For one, Appellants' suits are not aimed at

vindicating the rights of taxpayers so much as remedying their *own* injuries

resulting from the Final Rule—the revenues lost from diminished contributions.

It is doubtful that Appellants could recruit a taxpayer able to present relevant

arguments on their behalf, "as opposed to arguments that highlight the

taxpayer's more individual interests." *Id.* at 578. Even if Appellants *could* recruit

a taxpayer to undertake the heavy burden of litigating their position against the

IRS, *Regan* acknowledges an exception to the AIA when "Congress has [not]

provided an alternative avenue for an aggrieved party to litigate *its claims on its*

*own behalf.*" *Regan*, 465 U.S. at 381 (emphasis added). It is therefore irrelevant

24

whether a third-party taxpayer could also assert a challenge to the Final Rule.
*See Yellen*, 15 F.4th at 578.

The Government's entreaty that we limit the *Regan* exception to

constitutional claims is similarly unavailing. That argument is premised on the

fact that both *Regan* and *Yellen* involved constitutional challenges to federal tax

law. But neither of those cases tethers its AIA analysis to the constitutional

nature of the plaintiffs' claims, and our precedents and those of our sister

Circuits suggest that the *Regan* exception is not so cabined. *See Larson v. United*

*States*, 888 F.3d 578, 587 n.11 (2d Cir. 2018) (noting that, under *Regan*, the

plaintiff's "ability to seek an injunction *pursuant to the APA* therefore also

depends on our determination of the availability of alternate review" (emphasis

added)); *In re Westmoreland Coal Co.*, 968 F.3d 526, 536 (5th Cir. 2020) (explaining

that courts view the exception in *Regan* "more broadly," and concluding that

"because bankruptcy court is the only place a debtor can" challenge certain

statutory tax obligations, "the AIA does not bar adversary proceedings seeking

to do so."); *In re Walter Energy, Inc.*, 911 F.3d 1121, 1142 (11th Cir. 2018) ("Because

Walter Energy has no alternative remedy to seek relief [from certain statutory tax

obligations], we conclude that the exception to the Anti-Injunction Act identified

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

in *Regan* applies.").  Finding no support in the caselaw, we decline to graft a constitutional-claims requirement onto the *Regan* exception.

Without this injunctive action, Appellants would have no recourse to pursue their claims that the Final Rule exceeds the IRS's rulemaking authority and that it is arbitrary and capricious under the APA.  Accordingly, the *Regan* exception to the AIA applies, and the AIA does not foreclose federal court jurisdiction over Appellants' claims.

### III.    Statutory Authority under I.R.C. § 170

Assured of our jurisdiction to hear this appeal, we first address Appellants' argument that the Final Rule is contrary to I.R.C. § 170, which governs the federal tax deduction for charitable contributions.  We conclude that the Final Rule correctly interprets I.R.C. § 170 as applied to Appellants' tax-credit programs.

Our review begins with the bedrock principle that "an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  "An administrative agency does not have authority to pass regulations that are inconsistent with the meaning of a statute."  *Art & Antique Dealers League*

26

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

*of Am., Inc. v. Seggos*, 121 F.4th 423, 435 (2d Cir. 2024). When a litigant challenges

an agency's interpretation of a statute that it administers, "the question a court

faces . . . is always, simply, whether the agency has stayed within the bounds of

its statutory authority." *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 74

(2d Cir. 2020).

Under the APA, a court may review "[a]gency action made reviewable by

statute and final agency action for which there is no other adequate remedy in a

court." 5 U.S.C. § 704. The APA directs courts to "interpret constitutional and

statutory provisions" and to "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . not in accordance with law."

*Id.* § 706(2)(A).

To determine whether the IRS exceeded its statutory authority in

promulgating the Final Rule, the district court adhered to the two-step

framework set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,*

*Inc.*, 467 U.S. 837 (1984). It concluded that I.R.C. § 170 "does not clearly and

unambiguously address the specific question of whether contributions made to

state and local governmental units in exchange for tax credits are 'charitable

contributions' . . . and therefore fully deductible." *Mnuchin*, 2024 WL 1386080, at

27

*22.  Next, it decided that the Final Rule's construction of I.R.C. § 170 "is a reasonable policy for the IRS to pursue," and that such construction was entitled to deference.  *Id.* at *24.

Shortly after this appeal was filed, however, the Supreme Court ended *Chevron* deference.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) ("*Chevron* is overruled.").  "In the post-*Chevron* era, regardless of whether a statute is deemed to be ambiguous or unambiguous, interpretation of the statute is a question of law, and accordingly, it is the court, and not the administrative agency, that determines its meaning."  *Art & Antique Dealers League*, 121 F.4th at 435.  Confronted with statutory ambiguity, courts are to "use every tool at their disposal to determine the *best* reading of the statute and resolve the ambiguity."  *Loper Bright*, 603 U.S. at 400 (emphasis added).

Appellants here rightly observe that the Supreme Court in *Loper Bright* "displaced the district court's rationale for concluding that the 2019 Final Rule did not exceed the IRS's statutory authority."  Scarsdale Opening Br. at 11.  Because the district court applied *Chevron* to reach its conclusion that the Final Rule is within the IRS's congressionally conferred authority, the question must be considered anew under *Loper Bright*'s mandate that courts determine the "best

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

reading of the statute" using "every tool at their disposal." *Loper Bright*, 603 U.S.

at 400.  The IRS's interpretation of I.R.C. § 170 is entitled to no deference.

To be sure, *Loper Bright* supplants the process by which the district court

arrived at its conclusion.  It does not foreclose the conclusion itself.  Indeed, "an

agency's interpretation of a statute," while not binding, "may be especially

informative to the extent it rests on factual premises within the agency's

expertise." *Id.* at 402.  That expertise "may give an Executive Branch

interpretation particular 'power to persuade, if lacking power to control.'" *Id.*

(quoting *Skidmore v. Swift Co.*, 323 U.S. 134, 140 (1944)).

A.     I.R.C. § 170 and the *Quid Pro Quo* Principle

When interpreting a statute, "we begin with the plain language of the

statute, giving the statutory terms their ordinary or natural meaning." *Spadaro v.*

*U.S. Customs & Border Prot.*, 978 F.3d 34, 46 (2d Cir. 2020).  When that meaning is

unclear, "we make use of a variety of interpretive tools, including canons,

statutory structure, and legislative history." *Id.*  And "[t]he settled judicial

construction of a particular statute is of course relevant in ascertaining statutory

meaning." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 361 (2013).

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

Section 170 of the Internal Revenue Code permits taxpayers who itemize

deductions to deduct "any charitable contribution."  26 U.S.C. § 170(a).  The term

"charitable contribution" is defined, in relevant part, as a "contribution or gift to

or for the use of . . . [a] State . . . or any political subdivision [thereof]" so long as

"the contribution or gift is made for exclusively public purposes."  *Id.* § 170(c)(1).

I.R.C. § 170 does not further define "contribution" or "gift," and the legislative

history of the "contribution or gift" limitation is "sparse."  *Hernandez v. Comm'r*,

490 U.S. 680, 690 (1989).  The construction of that term has been shaped largely

by the decisional law.  Those precedents illuminate an important *quid pro quo*

principle underpinning the meaning and objective of I.R.C. § 170.[12]

A payment of money or property to an entity recognized by I.R.C. § 170(c)

"generally cannot constitute a charitable contribution if the contributor expects a

substantial benefit in return."  *United States v. Am. Bar Endowment*, 477 U.S. 105,

116 (1986).  If, in exchange for a donation, a taxpayer receives a return benefit

---

[12] The States' contention that "[t]his case begins and ends with the statutory text," States'
Opening Br. at 28, oversimplifies the interpretative task before us.  The text of I.R.C. § 170, in
isolation, provides very little for us—or the States—to go on.  *See* 26 U.S.C. § 170.  That is why
the States themselves make extensive reference to the caselaw in presenting their argument.
Much of the settled understanding of I.R.C. § 170—including the *quid pro quo* principle—derives
not from the four corners of the statute itself, but from the meaning imputed to that statute by
our precedents.  Accordingly, we look in part to those precedents to decide whether the IRS
acted in accord with its statutory authority by promulgating the Final Rule.

"commensurate with the payment or if obtaining the benefit is the reason for

making the payment, . . . the payment is a *quid pro quo* rather than a gift."

*Hernandez v. Comm'r*, 819 F.2d 1212, 1219 (1st Cir. 1987), *aff'd*, 490 U.S. at 703.  At

minimum, the taxpayer must "demonstrate that he purposely contributed money

or property *in excess of* the value of any benefit he received in return."  *Am. Bar

Endowment*, 477 U.S. at 118 (emphasis added).  Only then may he "claim a

deduction for the difference between a payment to a charitable organization and

the market value of the benefit received in return."  *Id.* at 117.  Simply put, a

charitable contribution for the purposes of § 170 is one "made with the intention

of making a gift."  *Id.*; *see also Sutton v. Comm'r*, 57 T.C. 239, 242–43 (1971) ("If a

payment proceeds primarily from the incentive of anticipated benefit to the

payor beyond the satisfaction which flows from the performance of a generous

act, it is not a gift.").

Of course, there may be any number of subjectively valuable benefits a

donor hopes to obtain by making a charitable contribution:  a sense of pride at

having advanced a worthwhile cause, cachet in his community, or admission at

the pearly gates.  *See Graham v. Comm'r*, 822 F.2d 844, 848 (9th Cir. 1987) ("[I]t is

true that the entire complex of a payor's motives often is not divorced from self-

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

interest."), *abrogated in part on other grounds by, Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024 (9th Cir. 2007). And many donors likely have in mind what their largesse will mean come tax season and intend to take advantage of the various tax incentives offered to promote charitable giving.

But our approach to decide whether a transaction is structured in the form of a *quid pro quo* elides an inquiry into the donor's subjective state of mind. *See Scheidelman v. Comm'r*, 682 F.3d 189, 199 (2d Cir. 2012). Our test instead centers on "the external features of the transaction in question." *Id.* Courts look for any "measurable, specific return [that] comes to the payor as a quid pro quo for the donation." *Graham*, 822 F.2d at 848. "[W]here it is understood that the taxpayer's money will not pass to the charitable organization unless the taxpayer receives a specific benefit in return, and where the taxpayer cannot receive the benefit unless he pays the required price, then the transaction does not qualify for the deduction under section 170." *Scheidelman*, 682 F.3d at 199; *see also Rolfs v. Comm'r*, 668 F.3d 888, 891 (7th Cir. 2012) ("The IRS and the courts look to the objective features of the transaction, not the subjective motives of the donor, to determine whether a gift was intended or whether a commensurate return could be expected as part of a quid pro quo exchange."). And our focus on external

32

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

features rather than subjective motive typically means that "a donation . . . for the exclusive purpose of receiving a tax deduction does not vitiate the charitable nature of the contribution." *McLennan v. United States*, 24 Cl. Ct. 102, 106 n.8 (1991). After all, "[i]f the motivation to receive a tax benefit deprived a gift of its charitable nature under Section 170, virtually no charitable gifts would be deductible." *Scheidelman*, 682 F.3d at 200.

We propounded our understanding of the *quid pro quo* principle in *Scheidelman*. There, Huda Scheidelman donated a façade conservation easement—a type of easement to preserve the appearance of historic properties—for her Brooklyn brownstone to the National Architectural Trust (the "Trust"). *Id.* at 192. For her donation of the easement, valued at $115,000, Scheidelman could seek a tax deduction under I.R.C. § 170(f)(3)(B)(iii). The Trust required that, in addition to the easement donation, Scheidelman make a cash contribution to the Trust worth $9,275 to fund the Trust's administration of the easement in perpetuity. *Id.* at 193. Scheidelman made that contribution and later attempted also to deduct it on her taxes as a charitable contribution under I.R.C. § 170. *Id.* The IRS disallowed the deduction, concluding that because "Scheidelman had made the donation for the purpose of inducing the Trust to

33

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

accept her easement so that she could enjoy a tax benefit"—the conservation-easement deduction—it could not be considered a "payment made for detached and disinterested motives." *Id.* The Tax Court sided with the IRS.

We reversed, holding that the $9,275 contribution *was* deductible. Under I.R.C. § 170, we explained, a charitable contribution "is a transfer of money or property without adequate consideration." *Id.* at 199 (quoting *Am. Bar Endowment*, 477 U.S. at 118). Importantly, "[t]he consideration need not be financial; medical, educational, scientific, religious, or other benefits can be consideration that vitiates charitable intent." *Id.*; *see also Graham*, 822 F.2d at 849 ("The test is not the economic character of what the payor receives but whether there is a specific, measurable quid pro quo for the donation in question."). The paradigmatic example, as described by Congress when it enacted § 170, is a donation to a hospital "given in exchange for a binding obligation to provide medical treatment." *Scheidelman*, 682 F.3d at 199; *see also* S. Rep. No. 83-1622, at 4830–31 (1954); H.R. Rep. No. 83-1337, 83d Cong., 2d Sess., at 4180 (1954). By disallowing deductions for such transactions, "Section 170 distinguishes between '*unrequited* payments to qualified recipients and payments made to such

34

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

recipients *in return for* goods or services.'"  *Scheidelman*, 682 F.3d at 199

(emphases added) (quoting *Hernandez*, 490 U.S. at 690).

The external features of the Scheidelman-Trust transaction did not evince

the kind of reciprocal exchange that precludes a deduction under § 170.  "While

Scheidelman's $9,275 donation might be described as a *prerequisite* of the Trust's

acceptance of the easement donation, the Trust gave the taxpayer no 'goods or

services,' or 'benefit,' or anything of value in return for her making the money

gift.  The only transfer of benefit was what the taxpayer gave to the Trust."  *Id.* at

200.  It is of no consequence that the donor "may expect to derive benefit

*elsewhere*," such as Scheidelman's expectation of a deduction on her income taxes.

*Id.* (emphasis added).  The locus of the inquiry was whether Scheidelman

received a "benefit *from the Trust* in exchange for her cash donation."  *Id.*

(emphasis added).  Because she did not, there was no *quid pro quo*, and her cash

contribution was eligible for deduction under § 170.

B.    Discussion

As applied to Appellants' tax-credit programs, the Final Rule comports

with the *quid pro quo* principle, requiring a taxpayer to subtract the value of a tax

credit that he "receives or expects to receive in consideration for the taxpayer's

35

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

payment or transfer." 26 C.F.R. § 1.170A-1(h)(3)(i).[13] Certainly, a tax credit that

offsets a taxpayer's state or local tax liability is an "identifiable benefit,"

*Hernandez*, 490 U.S. at 691, because it substantially reduces the amount of money

that the taxpayer is ultimately on the hook for, freeing up those funds for

discretionary expenses. Unlike more subjective benefits—esteem or influence,

say—it is also easily calculable based on external features, as it is a defined

percentage of the contribution's dollar amount. Indeed, from a donor's

perspective, the practical consequence of a donation to New York's fund, for

example, is indistinguishable from the State handing the donor a stack of cash

worth 85% of her contribution. *See* N.Y. Tax Law § 606(iii). As a practical matter,

the "charitable organization[s]"—the state-administered public funds designated

by Appellants—should not expect a contribution from a taxpayer "unless the

taxpayer receives a specific benefit in return," the tax credit. *Scheidelman*, 682

---

[13] We acknowledge that the circumstances here are *sui generis*. A typical return benefit one might receive for a contribution to a *private* charitable entity cannot take the form of a tax credit because private entities are not empowered to authorize tax credits; only a government may do that. The caselaw reflects this reality, often speaking of tax benefits in terms that do not account for the present circumstance, wherein the charitable entity *is* the state, and the return benefit is meted out through the tax code. But even though we could not identify a perfectly analogous fact pattern in our precedents, we think that the Final Rule's interpretation of I.R.C. § 170 as applied to Appellants' programs effectuates the *quid pro quo* principle. Appellants may not evade that principle simply because they are in the unique position to offer a return benefit in the shape of a tax credit, when a private charitable entity could not.

36

F.3d at 199.  This is shown by the fact that, once the tax credit was rendered valueless to taxpayers by the Final Rule, contributions to Appellants' funds all but dried up.  And "the taxpayer cannot receive the benefit unless he pays the required price"—contribution to the public fund.  *See id*.

Appellants counter that the Final Rule's construction of I.R.C. § 170 defies the general precept that "[i]f the motivation to receive a tax benefit deprived a gift of its charitable nature under Section 170, virtually no charitable gifts would be deductible."  *Id.* at 200.  A taxpayer's desire to obtain the *state* tax credit, the argument goes, cannot spoil his eligibility for the *federal* tax deduction under § 170.

Appellants' theory misstates the *quid pro quo* principle at several turns.  First, our inquiry centers on "the external features of the transaction in question," not on the subjective motivations of the donor.  *Id.* at 199.  Our conclusion that Appellants' tax-credit programs constitute a *quid pro quo* is not based on the proposition that a taxpayer who contributes to a state fund does so to derive a tax benefit—though that is plainly most often the case—but on the outward, quantifiable features of the transaction.  The state or locality receives a contribution that approximates the amount the taxpayer would otherwise have

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

paid in taxes, which it then invests in public programs akin to those usually financed by tax revenues. Then, the same state or locality that was the recipient of the contribution extends a sizeable tax credit to the contributor, erasing the bulk of his state tax liability. The fundamental this-for-that contour of the arrangement is exactly the type of *reciprocal* exchange that has long been deemed disqualifying for the § 170 deduction. *See id.* at 200; *Hernandez*, 490 U.S. at 690–92; *Am. Bar Endowment*, 477 U.S. at 116–18.

Appellants' argument that a taxpayer's desire to receive a state tax credit cannot impair § 170 eligibility founders for another reason too. When courts have expressed the idea that "the motivation to receive a tax benefit" cannot "deprive[] a gift of its charitable nature under Section 170," the tax benefit to which they refer is virtually always the § 170 deduction itself. *See Scheidelman*, 682 F.3d at 200. Indeed, in every case Appellants cite in support of their argument, the court considered a § 170 deduction, *not* a tax credit. *See Mann v. United States*, 364 F. Supp. 3d 553, 567–68 (D. Md. 2019) ("the expected tax deduction . . . is not a 'specific benefit' transforming the donation into a *quid pro quo*"), *aff'd*, 984 F.3d 317 (4th Cir. 2021); *McLennan*, 24 Cl. Ct. at 106; *Browning v. Comm'r*, 109 T.C. 303, 325 (1997) ("Respondent's argument suggests that a

38

taxpayer making a gift of stock worth $100 to a charitable organization may be entitled to a charitable contribution deduction of some lesser amount on account of the economic value of the deduction.  That suggestion is untenable."); *Skripak v. Comm'r*, 84 T.C. 285, 319 (1985); *Mount Mercy Assocs. v. Comm'r*, 67 T.C.M. 2267 (T.C. 1994), *aff'd*, 50 F.3d 2 (2d Cir. 1995).  Here, it is not the taxpayer's desire to claim a § 170 *deduction* that "deprive[s] [his] gift of its charitable nature under Section 170," *Scheidelman*, 682 F.3d at 200, but his receipt of a tax credit *from* the beneficiary of his donation—the state or locality.

We also find unconvincing Appellants' argument that the Final Rule contravenes § 170 by treating state tax *credits* as return benefits that negate charitable intent while simultaneously conceding that "neither state nor federal charitable contribution *deductions* are treated as return benefits."  84 Fed. Reg. at 27,521 (emphasis added).  We do not think that Congress views tax deductions as implicating the *quid pro quo* principle in the same manner as a tax credit.  Among the entities qualified to receive a charitable contribution under I.R.C. § 170 are "the United States or the District of Columbia . . . if the contribution or gift is made for exclusively public purposes."  26 U.S.C. § 170(c)(1).  It would contradict the text of § 170—which clearly permits a federal tax *deduction* for gifts to the

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

United States—to say that such a gift necessarily worked a *quid pro quo* by virtue

of the corresponding federal deduction, thereby barring eligibility for that very

deduction.  If § 170 espouses an implicit *quid pro quo* principle while nonetheless

permitting a tax deduction *from the federal government* for donations *to the federal*

*government*, it follows that Congress did not consider a tax deduction to be a

return benefit vitiating charitable intent.  And, in the absence of any evidence to

the contrary, we infer that Congress likewise did not consider a state tax

*deduction* to implicate § 170's *quid pro quo* principle.[14]

A tax *credit*, on the other hand, is a horse of a different color.  We see no

analogous statutory evidence that Congress does not view a state tax *credit* in

return for a contribution to a state fund as implicating the *quid pro quo* principle.

Moreover, a tax credit affords a direct offset of the contributor's tax bill that is a

---

[14] One could argue that the boundary between a tax deduction and a tax credit is a fuzzy one,
and that what is labeled a tax deduction may, depending on its design, function more like a tax
credit.  For example, a state might enact a "tax deduction" that permits a donor to a charitable
entity to "deduct" from his income $5 for every $1 contributed to charity.  Or it might key the
amount of a deduction to a donor's particular marginal tax bracket, such that those whose
income places them in a higher marginal bracket are entitled to a greater deduction per dollar
contributed than those in a lower bracket.  But we adopt a more functionalist view of tax
deduction, consistent with how that term has conventionally been understood and applied, to
mean a reduction in taxable income that does not exceed (in fact, is typically equivalent to) the
amount of the taxpayer's payment or transfer entitling him to that deduction.  Indeed, this is the
same understanding of "tax deduction" contained in the Final Rule.  *See* 26 C.F.R. § 1.170A-
1(h)(3)(ii).

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

"specific [and] measurable" benefit, *Graham*, 822 F.2d at 849, not one that is variable with a taxpayer's marginal tax rate. For a $10,000 contribution to New York's public fund, a taxpayer—regardless of his income level or marginal tax bracket—receives a tax credit worth $8,500. N.Y. Tax Law § 606(iii). But under a tax-deduction system, the *quid* does not always yield the same *quo*. A $10,000 contribution might produce $1,030 in income-tax savings for a New York donor whose income is taxed at a marginal rate of 10.3%, but just $600 for one whose income is taxed at a marginal rate of 6%. *See* N.Y. Tax Law § 601. This variability suggests that tax deductions are not the target of the *quid pro quo* principle, which requires that "a *commensurate* return . . . be expected" by the donor. *Rolfs*, 668 F.3d at 891 (emphasis added).[15] A charitable contribution eligible for the § 170 deduction must be "made with the intention of making a gift." *Am. Bar Endowment*, 477 U.S. at 117. We are disinclined to hold that the external characteristics of a tax deduction—where the "benefit" received by the taxpayer is largely a function of the taxpayer's personal financial circumstances and not just in recognition of the magnitude of his gift—demonstrate that contributions

---

[15] True, the actual value of a tax credit to an individual taxpayer may vary depending on the taxpayer's financial circumstances. After all, a tax credit of $8,500 may yield an actual benefit of only $5,000 to a taxpayer whose tax liability is only $5,000. But in assessing the best meaning of § 170, we focus on the financial impact to a typical taxpayer, not the anomalous case.

41

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

in return for a state tax deduction would categorically be "made with[out] the intention of making a gift." *Id.*

Appellants advance several other arguments for why the Final Rule exceeds the scope of § 170, but none prevails. First, Appellants contend that the *quid pro quo* principle is limited to circumstances in which payments are exchanged for "goods or services." To support this argument, Appellants cherry-pick a few lines from the relevant precedents. *See, e.g.*, *Hernandez*, 490 U.S. at 690 ("Congress intended to differentiate between unrequited payments to qualified recipients and payments made to such recipients in return for goods or services. Only the former were deemed deductible."). But a closer look at these precedents reveals the *quid pro quo* principle is not so cramped. While tangible "goods or services" might indicate the existence of a *quid pro quo*, such an exchange arises whenever a taxpayer receives a "substantial benefit in return" for his payment. *American Bar Endowment*, 477 U.S. at 116; *see also Hernandez*, 490 U.S. at 691 (noting a "quintessential quid pro quo" where "in return for their money, petitioners received an identifiable benefit"); *Scheidelman*, 682 F.3d at 200 (holding that a taxpayer's donation was a deductible gift because the recipient "gave the taxpayer no 'goods or services,' *or 'benefit,' or anything of value* in return

42

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

for her making the money gift") (emphasis added); *Sutton*, 57 T.C. at 242–43

(observing that the definition of "charitable" in the context of § 170 generally

refers to the transfer of property "without consideration"—not "consideration in

a common-law sense, but rather in a more colloquial sense" to mean "the

incentive of anticipated benefit . . . beyond the satisfaction which flows" from the

act).

Even were we to adopt Appellants' goods-and-services theory, they

provide no compelling authority to support their contention that tax credits

"cannot, under any reasonable definition, be considered goods or services."

Scarsdale Opening Br. at 20.  Black's Law Dictionary offers, as one definition of

"goods," "[t]hings that have value, whether tangible or not."  *Goods*, Black's Law

Dictionary (12th ed. 2024).  That taxpayers in New York and Scarsdale were

motivated to pay into public funds and receive tax credits indicates that those

credits indeed "have value" to the taxpayers who seek them.  As another

example, IRS regulations—albeit pertaining to a different section of the tax

code—define "goods or services" as "cash, property, services, benefits, and

privileges."  26 C.F.R. § 1.170A-13(f)(5).  Appellants' tax credits qualify as

benefits or privileges that inure to the taxpayer. So, the argument that tax credits

are not "goods or services" subject to *the quid pro quo* principle is unconvincing.

Appellants next point to the Supreme Court's decision in *Randall v.*

*Loftsgaarden*, 478 U.S. 647 (1986), where the Court observed that "[u]nlike

payments in cash or property . . . the 'receipt' of tax deductions or credits is not

itself a taxable event, for the investor has received no money or other 'income'

within the meaning of" I.R.C. § 61, which defines "gross income," *id.* at 656–67.

The States also remark that "tax benefits . . . do not count toward the 'amount

realized' on a sale of property under Section 1001 of the Tax Code." States'

Opening Br. at 30. From these observations, Appellants reason that "[i]f tax

benefits do not count as money or income for purpose of a taxable event or as an

amount realized from a sale . . . they logically do not count as return goods for

the purpose of Section 170 either." *Id.* But Appellants never explain how or why

the question of whether something is taxable *income* under the Internal Revenue

Code is relevant to whether a payment or transfer is tax-deductible as a

charitable contribution under § 170. Nor could they. We have made clear that a

return benefit precluding deduction under § 170 "need not be financial; medical,

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

educational, scientific, religious, or other benefits can be consideration that

vitiates charitable intent." *Scheidelman*, 682 F.3d at 199.

Finally, Appellants argue that states have long had tax-credit programs in

place, and Congress knew about these programs when it enacted the SALT cap.

Congress also presumably knew of the IRS's long-standing interpretation of

§ 170 as permitting deductions despite state tax credits.  If Congress had wanted

to allow something akin to the Final Rule, Appellants contend, it would therefore

have said as much when it passed the 2017 Tax Act.  But while the Supreme

Court has "recognized congressional acquiescence to administrative

interpretations of a statute in some situations, [it] ha[s] done so with extreme

care." *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S.

159, 169 (2001).  Congressional acquiescence should only be inferred when there

is "overwhelming evidence" of such acquiescence, *id.* at 169 n.5, such as

"evidence that Congress considered and rejected the 'precise issue' presented

before the Court," *Rapanos v. United States*, 547 U.S. 715, 750 (2006).  Because no

evidence exists here that Congress considered the "precise issue" raised by the

Final Rule—indeed, it was the 2017 Tax Act itself that spurred Appellants to

enact their tax-credit programs, which in turn engendered the Final Rule—we

45

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

will not infer that Congress tacitly endorsed the IRS's earlier interpretation of

§ 170.[16]

We conclude that the Final Rule correctly interprets I.R.C. § 170 as applied

to Appellants' tax-credit programs and that the IRS did not exceed its statutory

authority.[17]

## IV.    Arbitrary-and-Capricious Review

An agency's action is arbitrary and capricious if "the agency has relied on

factors which Congress has not intended it to consider, entirely failed to consider

an important aspect of the problem, offered an explanation for its decision that

runs counter to the evidence before the agency, or is so implausible that it could

---

[16] We note also that Congress did not address the state and local tax-credit programs in its most recent tax legislation, the One Big Beautiful Bill Act, which raises an argument at least as compelling as Appellants' that Congress did *not* mean to dislodge the Final Rule's interpretation of I.R.C. § 170.  While we do not think Congress addressed the "precise issue" in either the 2017 Tax Act or the One Big Beautiful Bill Act, we merely observe that, in light of recent legislative developments, Appellants' contention that we infer congressional acquiescence to the IRS's earlier interpretation of § 170 is particularly weak.

[17] We do not decide today whether the Final Rule's preclusion of a § 170 deduction in instances where the tax credit comes not from the recipient of a gift but from a third-party government exceeds the scope of I.R.C. § 170.  *See* 26 C.F.R. § 1.170A-1(h)(4)(i).  Appellants do not argue here that the rule's application to *all* tax-credit-for-contribution programs (exempting those where the tax credit does not exceed 15% of a contribution) renders the regulation unlawful.  "In our adversarial system of adjudication, we follow the principle of party presentation" under which we do not "sally forth each day looking for wrongs to right" but instead "decide only questions presented by the parties."  *In re TransCare Corp.*, 81 F.4th 37, 58 (2d Cir. 2023).

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

not be ascribed to a difference in view or the product of agency expertise." *Am.*

*Cruise Lines v. United States*, 96 F.4th 283, 286 (2d Cir. 2024). Courts are "not to

substitute [their] judgment for that of the agency," but "instead to assess only

whether the decision was based on a consideration of the relevant factors and

whether there has been a clear error of judgment." *Dep't of Homeland Sec. v.*

*Regents of Univ. of Cal.*, 591 U.S. 1, 16 (2020).

Unlike our review of an agency's interpretation of a statute, under which

the agency is accorded no deference, our review of agency action under the

"arbitrary and capricious standard of review is narrow and particularly

deferential." *Env't Def. v. EPA*, 369 F.3d 193, 201 (2d Cir. 2004); *see also Loper*

*Bright*, 603 U.S. at 392 ("Section 706 [of the APA] *does* mandate that judicial

review of agency policymaking and factfinding be deferential."). An agency

action survives arbitrary-and-capricious review so long as the agency

"examine[d] the relevant data and articulate[d] a satisfactory explanation for its

action including a rational connection between the facts found and the choice

made." *New York v. Raimondo*, 84 F.4th 102, 106–07 (2d Cir. 2023) (quoting *Motor*

*Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983)).

47

We are not persuaded by Appellants' arguments that the Final Rule is arbitrary and capricious.  First, Appellants claim, the IRS failed "to adequately explain the inconsistent treatment between tax credits and deductions" or consider "the disincentives to charitable giving" posed by the Final Rule.  States Br. at 43; Scarsdale Br. at 23–24.  The Final Rule's distinction between tax credits and deductions, Appellants contend, fails to "treat[] like cases alike."  States Br. at 44.  But Appellants' characterization of the distinction as insufficiently explained is contradicted by the preamble of the Final Rule.  The preamble states that "a dollar-for-dollar state or local tax deduction does not raise the same concerns as a state or local tax credit, and it would produce unique complications if it were to be subject to the *quid pro quo* principle."  84 Fed. Reg. at 27,520.  This is because "[t]he economic benefit of a dollar-for-dollar deduction is limited because it is based on a taxpayer's state and local marginal rate," so "the risk of a taxpayer using such deductions to circumvent [the SALT deduction cap], and the potential revenue loss, is comparatively low."  *Id.*  In terms of administrative concerns, "if state and local tax deductions for charitable contributions were treated as return benefits, it would make the accurate calculation of federal taxes and state and local taxes difficult for both taxpayers and the IRS."  *Id.*  Especially

48

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

when read against the understanding that "the major responsibility of the

Internal Revenue Service is to protect the public fisc," *United States v. Hughes*

*Props., Inc.*, 476 U.S. 593, 603 (1986), the IRS's focus on the revenue consequences

of treating tax credits and deductions differently is "within a zone of

reasonableness," *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

As to the contention that the Final Rule disincentivizes charitable giving

generally, that consideration was thoroughly ventilated by the IRS. The Final

Rule continues to allow deductions for "the portion of a taxpayer's charitable

contribution that is a gratuitous transfer," and leaves state and local-level tax

benefits untouched. 84 Fed. Reg. at 27,522. The Final Rule might make

contributions to Appellants' funds less likely (because those contributions were

presumably motivated by the prospect of a § 170 deduction notwithstanding the

simultaneous state tax credit), but that does not mean that charitable

contributions *generally* will be deterred.

Second, Appellants contend that the Final Rule's exemption for tax credits

at or below 15% of a contribution's value is arbitrary and unsupported by

sufficient explanation. They point to a "cliff effect" resulting from the 15%

threshold: While a taxpayer who receives a tax credit worth 15% of the value of

49

his charitable contribution may deduct the entirety of that contribution on his

federal tax return, the taxpayer who receives a tax credit worth 16% of her

contribution must subtract the value of that credit from her § 170 deduction.

Appellants' concern does not, however, render the Final Rule unreasonable.  For

one, Appellants' same argument could be made regardless of where the IRS

draws the line, and there is no rule against drawing bright-line rules.  *See, e.g.,*

*Mass. Dep't of Pub. Welfare v. Sec'y of Agric.*, 984 F.2d 514, 522 (1st Cir. 1993)

("When Congress entrusts an agency with the responsibility for drawing lines,

and the agency exercises that authority in a reasonable way, neither the fact that

there are other possible places at which the line could be drawn nor the fact that

the administrative scheme might occasionally operate unfairly from a particular

participant's perspective is sufficient, standing alone, to undermine the scheme's

legality.").  And the 15% exception was not plucked from thin air.  Rather, it

reflects "the combined top marginal state and local tax rates, which the Treasury

Department and the IRS understand currently do not exceed 15 percent."  84 Fed.

Reg. at 27,520.  Therefore, as the IRS explained, the 15% exception "ensures that

taxpayers in states offering state tax deductions and taxpayers in states offering

economically equivalent credits are treated similarly."  *Id.*  The theoretical

24-1499-cv(L)
*New Jersey v. Bessent*; *Village of Scarsdale v. IRS*

possibility that marginal state or local tax rates might someday exceed 15% does not invalidate the data used to inform the Final Rule at present, and the IRS is not barred from amending the rule if significant changes to state and local tax law transpire.  The Final Rule's 15% exception is reasonable, and the IRS's rationale for it was adequately explained.

Third, Appellants argue that the IRS "relied on factors that Congress did not intend the agency to consider under Section 170" because it "focus[ed] on an unrelated and irrelevant provision of the Code—Section 164," governing the SALT deduction.  Scarsdale Br. at 23–24; States Br. at 44.  But the SALT deduction cap contained in § 164 was designed to raise revenue, and there was nothing improper about the IRS considering that congressional objective in designing the Final Rule, even if the authority to promulgate that Rule derives from § 170.  And specific tax provisions "must be analyzed and construed within the framework of the Internal Revenue Code and against the background of the Congressional purposes."  *Bob Jones Univ. v. United States*, 461 U.S. 574, 586 (1983).  It was not arbitrary for the IRS to consider the whole of the tax code and its various revenue-raising provisions when promulgating the Final Rule.

51

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

Finally, Scarsdale claims that the Final Rule does not "acknowledge that [the IRS] is changing its existing policy," as spelled out in earlier internal memos and its litigating positions in earlier cases. Scarsdale Br. at 27–29. "When an agency changes its existing position, it need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate." *Encino Motorcars v. Navarro*, 579 U.S. 211, 221 (2016). But it "must at least display awareness that it is changing position and show that there are good reasons for the new policy." *Id.* Here, the former policy—which did not require taxpayers to subtract tax credits from § 170 charitable deductions—was never announced in a rule or formal advisory, but in a 2010 IRS Chief Counsel Advice ("CCA"), which is prohibited by statute from being "used or cited as precedent." 26 U.S.C. § 6110(b)(1)(A), (k)(3). In any case, the Final Rule explicitly "display[ed] awareness that it is changing policy," *Encino Motorcars*, 579 U.S. at 221, when it stated that it "questioned the reasoning of the 2010 CCA" after it began "reviewing the authorities under section 170," and that the Final Rule "depart[s] from the conclusion of the 2010 CCA in important respects," 84 Fed. Reg. at 27,514, 27,516. And the IRS "show[ed] that there are good reasons for the new policy," *Encino Motorcars*, 579 U.S. at 221, because the 2010 CCA relied on cases

52

24-1499-cv(L)
*New Jersey v. Bessent; Village of Scarsdale v. IRS*

that "did not specifically address whether the value of state or local tax credits should be treated as a *quid pro quo*," 84 Fed. Reg. at 27,516.

Moreover, "the analysis in the 2010 CCA assumed that after the taxpayer applied the state or local tax credit to reduce the taxpayer's state or local tax liability, the taxpayer would receive a smaller deduction for state and local taxes under [the then-uncapped SALT deduction]." *Id.* "In an area as complex as the tax system, the agency Congress vests with administrative responsibility must be able to exercise its authority to meet changing conditions and new problems." *Bob Jones Univ.*, 461 U.S. at 596. The assumptions underpinning the 2010 CCA no longer held true after the enactment of the SALT-deduction cap in the 2017 Tax Act and Appellants' introduction of new tax-credit schemes. It was reasonable for the IRS to revisit and repudiate its earlier position in light of developments that gave it the impetus to do so. That the Final Rule's interpretation of § 170 "may be seen as belated does not undermine its soundness." *Id.* at 595.

Appellants furnish no basis for us to conclude that the Final Rule is arbitrary or capricious.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

53